<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BARTON COHEN              :
      Plaintiff,          :

       v.                    :

UNUMPROVIDENT CORPORATION   :
a/k/a FIRST UNUM LIFE INSURANCE
COMPANY, a/k/a PROVIDENT LIFE     :
AND CASUALTY INSURANCE
COMPANY, a/k/a/ THE PAUL REVERE   :
LIFE INSURANCE COMPANY,
individually, jointly, severally, or in the    :
alternative,
          Defendants      :

Civil Action No. 03-736 (FLW)

OPINION

**APPEARANCES:**

For Plaintiff:
Warren W. Faulk
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108

For Defendants:
Andrew I. Hamelsky
White and Williams, LLP
The Atrium
East 80 Route 4
Paramus, New Jersey 07652

**WOLFSON, District Judge**

Presently before the Court are Plaintiff's Motion for Summary Judgment and Defendants' Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56. Plaintiff filed a five count Amended Complaint in the Superior Court of New Jersey, Camden County, Law Division, Docket No. CAM-L-7704-02, on January 22, 2003, alleging improper termination of his disability benefits. Defendants removed the action to this Court by Notice of Removal dated February 20, 2003. On June 1, 2005, the Court entered an Order dismissing Counts II, III and V of the Amended Complaint, pursuant to a conference call with the parties on that date during which Plaintiff's Counsel notified the Court of his intent not to oppose dismissal of those counts. The Court's jurisdiction is predicated on 28 U.S.C. § 1332(a)(1). For the reasons stated herein, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motion for Partial Summary Judgment is granted.

## I.    BACKGROUND

Plaintiff Barton Cohen purchased a disability insurance policy from Provident Life & Accident Insurance Company ("the Policy") that became effective on June 30, 1981.[1] Plaintiff's Exhibit ("Pl. Exh.") A at 3; Defendants' Exhibit ("Def. Exh.") 2 at 3. Plaintiff submitted a Claimants Statement for Disability Benefits on September 24, 2001, claiming that he was unable to work as a result of a mental disorder that approximately began on June 25, 2001. Pl. Exh. E at 1; Def. Exh. 4 at 1.

---

[1] Defendants submit that Plaintiff has improperly named the above-captioned Defendants because the insurance policy that is the subject of this motion was not issued by the Defendant in any of its current forms. Defendants are not challenging the propriety of Plaintiff's action, but have reserved their right to raise the issue at a later time. See Defendants' Opposition to Plaintiff's Motion for Summary Judgment at n.1.

## A.      Work History

According to his September 24, 2001 disability claim, Plaintiff had been working in pet

food home delivery until approximately June 25, 2001, when his disability began.  Pl. Exh. E at

1, 2; Def. Exh. 4 at 1, 2.  The Claimant Occupation Description filled out by Plaintiff states that

he had been delivering pet food for four years prior to his disability, and worked between ten and

twenty hours per week.  Def. Exh. 7 at 1; Def. Exh. 9 at 68:4-8.  Defendants argue, however, that

Plaintiff actually had not been working from 1998 through the date of his claim.  At his July 16,

2003 deposition, Plaintiff indicated at several points that he had not delivered pet food once he

closed National Pet Express, a dog grooming and pet food shop that he owned and operated

between 1996 and 1998, nor had he been employed in any other capacity.  Def. Exh. 8 at 18:6-16,

23:7.[2]

| | |
|---|---|
| Q: | And did you work at all for any company in 1998? |
| A. | No. |
| Q. | Okay.  And how about for 1999, do you remember-- |
| A. | No. |
| Q. | -- where you worked.  Okay.  You didn't work for anybody? |
| A. | No. |
| Q. | Okay.  What did you do in 1999? |
| A. | Walked the dog. |
| Q. | Okay. |
| A. | Took care of some household chores. |

---

[2]Plaintiff's work history prior to his involvement with pet food is undisputed.  From
1992-1996, Plaintiff was engaged in wholesaling of closeout merchandise; Plaintiff had been a
manufacturer's representative in a lady's accessory business for about twelve or thirteen years
prior to that time.  Def. Exh. 8 at 12:18-17:9.  Before working as a manufacturer's representative,
Plaintiff owned a sandwich shop for two years, id. at 12:8; owned a health spa for the two years
before that, id. at 11:20; and sold consumer savings program franchises for the two years
preceding his health spa ownership, id. at 11:10.  Plaintiff also designed, but unsuccessfully
marketed, a stainless steel tub and dryer system.  Def. Exh. 9 at 12:17-14:6.  Plaintiff is a high
school graduate, and has had some additional schooling, but has not obtained a college degree.
Def. Exh. 8 at 8:9-9:1.

Q.   Were you seeing a doctor in 1999 at all?

A.   No.

Q.   Okay.  Were you looking for a job in 1999 at all?

A.   No.

Q.   Did you help with your wife's business at all in 1999?

A.   No.

Q.   Okay.  And how about 2000, do you recall whether you were working at all?

A.   No.

Q.   You were not working?

A.   No.

Q.   Did you– and how about 2001, did you work at all?

A.   No.  That's when I, that's when I started to go, I became sick, and had to go on medication.

Q.   Okay.  Did you ever own a pet food delivery service out of your home?

A.   Yes.

Q.   Okay.  And when was that?

A.   That was during, during this, '96-'98.  Latter part of '98.  Latter part of '98.

Q.   Okay.  Did you ever do delivering pet food after you closed pet- National Pet Express?

A.   No.

Q.   Okay.  Once you closed that store, you stopped delivering pet food totally?

A.   Yes.

Q.   And you were not employed by any company at all in between the end after you closed the store in 1998 through 2001

A.   Right.

Id. at 26:24-28:22.

When questioned regarding the contrary representations on his claim forms, Plaintiff

testified as follows:

Q.   Okay.  You see it signed at the bottom, 9, 24, '01.  September 24, '01.

A.   Yes.

Q.   Okay.  And then it says on this, as called for pet food.  I want to know whether at this time in September of 2001, you were delivering pet food.

A.   It just says Employment Statement.

Q.   Right.  Next to that.

A.   That's what I did in '96 and '98.

Q.   Okay.  But not in 2001?

A.   No.

                    *          *          *

Q.   Okay.  And then number 11 says, number of hours worked prior to your disability.  It says 10 to 20 hours?

-4-

A.    Right.
Q.    Okay.  But that was referring to '96 to '98.
A.    Right.
Q.    Not 2001.
A.    Right.
Q.    Okay.  It says working out of home.  It says, did work out of home.  What work did you do out of your home?
A.    I delivered the food.
Q.    Okay.  Out of– I thought you did it from your store?
A.    And then I did a little bit from home for a month or so.
Q.    Oh. For a month or so.  Okay.
A.    That's all.
Q.    And that would take, how many hours, when you did it for that month, how long?
A.    Just 10 to 20 hours.
Q.    Okay.  But you only did it for one month?
A.    Yeah.

Id. at 65:4-65:14, 67:2-68:1.

Plaintiff's wife, Judith Cohen, testified that she filled out the Claimant Occupation

Description based on a guess as to Plaintiff's work schedule.

Q.    Okay. And Question 11 indicated number of hours worked per week.  That was 10 to 20 hours?
A.    Correct.
Q.    How did you know that?
A.    Basically I took an educated guess because my husband was not able to tell me too much of anything.

Def. Exh. 9 at 68:9-16.

Plaintiff contends, however, that the deposition in its entirety demonstrates that Plaintiff's

memory of facts and circumstances during those years is extremely limited, and that a number of

physicians, including independent medical examiners, have diagnosed Plaintiff with a cognitive

impairment resulting in memory loss.  Moreover, when questioned by his own attorney during

his deposition, Plaintiff identified a Profit and Loss statement from his 2000 tax return,

demonstrating $2625.00 in gross income for "pet grooming and supplies."  Def. Exh. 8 at

102:21-25.  Plaintiff repeatedly stated that he did not remember how many months he worked

during the year 2000.  Id. at 103:9-105:22.  Plaintiff also stated he stopped delivering pet food in

2000, and did not earn any income in 2001 as a result of his disorder.  Id. at 106:1-18.

According to Mrs. Cohen, Plaintiff was delivering pet food as of June, 2001, when he got

lost on a delivery and was gone for an hour and a half for a ten minute trip.  Def. Ex. 9 at

42:4-12.  She stated that he might have done "one or two" deliveries in July, 2001, but she saw

that he was becoming very ill and told him to stop.  Id. at 46:7-9.  She further testified that

Plaintiff had not worked in any capacity since that time.  Id. at 46:13-15.

### B.    Claim History

Plaintiff presented to Dr. William R. Pollard, Ph.D., on July 3, 2001, reporting feelings of

pressure, inability to sleep and appetite disturbance.  Def. Exh. 13 at 18:23-19:1; 23:11-15.  Dr.

Pollard diagnosed Plaintiff with generalized anxiety disorder at that time.  Pl. Exh. B at 21:20;

Def. Exh. 13 at 21:20.  Plaintiff returned to Dr. Pollard on July 7, 2001, complaining that he felt

like he was dying, was seriously depressed, and was unable to function.  Id. at 29:4-35:18.  Dr.

Pollard stated that at this session, he was "clearly beginning to be worried," about Plaintiff and

that this session indicated that he suffered from something greater than the initial diagnosis of

generalized anxiety disorder, which is characteristic of a "significant portion of the population."

Id. at 27:20-28:19.  However, he did not change the diagnosis at that time, because his normal

practice was not to make an immediate change in diagnosis unless required.  Id. at 36:4-9.  Dr.

Pollard also indicated that Plaintiff was taking antidepressants and sleeping pills.  Id. at 36:15-

37:2.

Plaintiff presented to the psychological emergency service at Underwood Memorial Hospital in Woodbury, New Jersey on July 25, and was treated there until August 8, 2001. Plaintiff's Rule 56.1 Statement of Material Facts at ¶ 6. The hospital diagnosed Plaintiff with bipolar disorder, and Dr. Pollard began working from this diagnosis. Def. Exh. 13 at 45:13-15, 70:7-16.

On August 22, 2001, Plaintiff first presented to psychiatrist Dr. Iluminado C. Ortanez, M.D., at Penn Friends, a mental health facility. Pl. Exh. D. at 15:15-17, Def. Exh. 14 at 15:15-17. At that time, Dr. Ortanez noted that Plaintiff was obsessed with his sick dog, slept on and off during the day and night, reported threatening thoughts toward his wife and dog, felt the need to work, and felt sad and indecisive. Id. at 16:1-13. Dr. Ortanez diagnosed Plaintiff with obsessive compulsive disorder. Id. at 16:13-14.[3]

Plaintiff returned to Underwood Memorial Hospital on September 29, 2001, when police removed him from his house because he was threatening his wife. Pl. Exh. C; Def. Exh. 5. The hospital also indicated that he was noncompliant with his medications and "angry."

UnumProvident completed a clinical review of Plaintiff's claims on November 19, 2001, relying primarily on (1) a UnumProvident disability claim form completed on September 21, 2001 by Dr. Pollard, which represented that Plaintiff was suffering from bipolar disorder, was unable to focus, and had sleep and appetite disturbances; (2) a field report conducted at

---

[3]On February 18, 2002, Dr. Ortanez supplemented this diagnosis to encompass "major depressive disorder severe, single episode with psychosis and obsessive compulsive disorder." Id. 31:19-21. Dr. Ortanez stated in his deposition that he did not diagnose Plaintiff with bipolar disorder because he never saw Plaintiff during a manic or a hypomanic episode. Id. at 71:16-25.

Plaintiff's home in early October, 2001; and (3) records from Plaintiffs' visits to Underwood Memorial Hospital.  Pl. Exh. F,  Pl. Exh. G. at 2.

The representative concluded that there was sufficient evidence to support a diagnosis of either major depression, or bipolar disorder, based on evidence in the file relating to cognition, agitation, mood dysfunction, and judgment.  Id.  He further concluded that these disorders would pose a "significant occ[upational] limitation" and that Plaintiff's prior and current treatment appeared to be appropriate.  Id.  UnumProvident approved Plaintiff's disability claim, and he began receiving payments in November 2001, including retroactive payments from July 4, 2001 forward.  Pl. Exh. H.

Plaintiff continued to see Dr. Pollard and Dr. Ortanez on a regular basis, and provided Defendants with notes regarding Plaintiff's progress.  Pl. Exh. I and J; Def. Exh. 10.  Dr. Pollard completed an Attending Physician's Statement for Defendants on March 8, 2002, indicating that Plaintiff was "improving (somewhat)" with respect to his bipolar disorder, inability to focus, and sleep and appetite disturbances.  Def. Exh. 5.  Dr. Pollard also represented that patient would be able to return to work on a part-time basis in three months, but was "questionable" to return to work on a full-time basis.

In light of Dr. Pollard's indication of "improvement," Defendants had Dr. Pollard complete a supplemental Attending Physician's Statement and submitted a Clinical Review Request to in-house psychological consultant Gina Vaswani on May 31, 2002.  Def. Exh. 11 at 1-2.  Dr. Pollard's June 7, 2002 statement noted that Plaintiff, who continued to suffer from bipolar disorder, was "brighter but remains somewhat pressured."  Pl. Exh. L; Def. Exh. 12.  Although Pollard checked the box stating that a "return to work [was] a focus of the treatment plan," he

also checked the box indicating that Plaintiff had not been "released to work in his/her occupation." Id. Dr. Pollard did not respond to the section of the form that asked for him to fully describe any "restrictions" or "limitations." Id.

Vaswani noted that she spoke with Dr. Pollard on June 13, 2002, and reported that he represented that the "insured is better and is functioning at the level he was prior to his manic episode and hospitalization. I again confirmed with Dr. Pollard that the insured is again functioning at his baseline." Id. at 4. As such, Vaswani concluded that there was no support for continued benefits, as Plaintiff was "functioning at his baseline (which reportedly was minimal)" as of that date. Id. Vaswani also noted that Ortanez' records indicated that on March 18, 2002, Plaintiff's hygiene was greatly improved, he was interested in doing things, his affect was "full and bright," he was sleeping well, and his obsessive compulsive disorder symptoms were "down." Id. at 3. She also cited Dr. Ortanez' May 6, 2002 note that Plaintiff continued to do well. Id.

On June 19, 2002, UnumProvident sent Plaintiff a letter advising him that it appeared that he no longer met the definition of total disability under the policy, and was therefore no longer entitled to disability benefits. Pl. Exh. 15 at 2; Def. Exh. M at 2. The letter stated that this determination was made upon a review of Plaintiff's claim file, including Dr. Pollard's June 7, 2002 Attending Physician's Statement, and his conversation with Vaswani. Id. at 1. Defendants enclosed a check for $3,300.00, representing benefits under the policy from June 3, 2002 through September 3, 2002, in order to assist Plaintiff's transition back to work. Id. at 2. Plaintiff's wife responded in a letter dated July 23, 2002, in which Plaintiff contested this determination and returned the $3,300.00 check. Pl. Exh. N at 1-2; Def. Exh. 16 at 1-2.

Defendants responded in an August 5, 2002 letter informing Plaintiff that he could submit additional information for consideration, or institute an appeal. Def. Exh. 17. On August 12, 2002, Dr. Pollard returned the phone call of a UnumProvident representative who asked whether Plaintiff was capable of returning to any employment. Def. Exh. 13 at 112:19-113:8. Dr. Pollard believes that he expressed to the caseworker that he did not think Plaintiff "was able to work and had not been for some time." Id. at 113:12-13. Dr. Pollard noted that he told the representative that Unumprovident could order an independent medical examination (IME), but was told that it was not worth it because Plaintiff was only receiving $500.00 per month in benefits. Id. at 112:9-15.

Dr. Pollard also sent a letter to UnumProvident on August 19, 2002 at Plaintiff's request. Pl. Exh. O; Def. Exh. 18. Dr. Pollard indicated that although Plaintiff has made "great progress" from the time that he required inpatient treatment at Underwood Memorial Hospital, he still could not handle complex tasks such as housecleaning; his concentration was impaired, as evidenced by his forgetting to close doors or turn off faucets; was unable to handle money; and had numerous compulsive rituals that made it "impossible to relate to others in a timely fashion." Id. at 1. Dr. Pollard concluded that "although Mr. Cohen is doing better than he was when he came out of Underwood Hospital, he is by no means free of symptoms or not disabled." Id. at 2.

In light of Pollard's letter, Defendants ordered another Clinical Review Request on September 17, 2002. Pl. Exh. P; Def. Exh. 19. Dr. Alex Ursprung, Ph.D., another UnumProvident in-house psychological consultant, reviewed the file and concluded that Plaintiff had "returned to his baseline state" and did not see support in the file for "restrictions and limitations which would prevent him from performing his occupational duties." Id. at 1-2.

Defendants sent another letter to Plaintiff on September 19, 2002, advising him that they received the August 19, 2002 letter from Dr. Pollard, and had an in-house psychologist conduct a review of his file, including the additional information.  Pl. Exh. Q; Def. Exh. 20.  Defendants stated that their conclusions regarding Mr. Cohen's ability to perform his occupational duties were unchanged and that their previous decision would not be altered.  Id.

### III.    DISCUSSION

#### A.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To show that a genuine issue of material fact exists, the nonmoving party may not rest upon mere allegations, but must present actual evidence in support thereof.  Id. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290 (1968)).  In evaluating the evidence, the Court must view evidence and draw inferences "in the light most favorable to the party opposing the motion."  Waldorf v. Shuta, 896 F.2d 723, 728 (3d Cir. 1990) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

**B.**     **Unfair Trade Settlement Practices Act/ Insurance Trade Practices Act, N.J.S.A. 17:29B-1, et seq.**[4]

Defendants argue that Count I of Plaintiff's Amended Complaint should be dismissed because the Insurance Trade Practices Act ("ITPA"), also known as the Unfair Trade Settlement Practices Act, N.J.S.A. 17:29B-1 et seq., does not support a private cause of action.[5]

New Jersey courts have uniformly held that N.J.S.A. 17:29B-1 does not support a private cause of action. See Pickett v. Lloyd's, 131 N.J. 457, 468 (1993) ("the regulatory framework [of the ITPA] does not create a private cause of action"); see also R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Agency, 168 N.J. 255, 278 (2001)(citing Pickett); Pierzga v Ohio Cas. Group of Ins. Cos., 208 N.J. Super. 40, 47 (App. Div. 1986) ("[N.J.S.A. 17:29B-1] applies to wrongs to the public rather than any individual and violations of the statute do not create individual or private causes of action."); Retail Clerks Welfare Fund, Local 1049, AFL-CIO v. Cont'l Cas. Co., 71 N.J. Super. 221, 225 (App. Div. 1961) ("[N.J.S.A. 17:29B] is a statute defining and prohibiting certain abuses in the insurance business and empowering the Commissioner of Banking and Insurance of this State to deal with them.").

---

[4]The Court notes that although Plaintiff's motion is described as a Motion for Summary Judgment, Plaintiff's motion is generally addressed to "summary judgment on the issue of liability with regard to his claim that the defendant acted in bad faith in terminating his disability benefits, and his entitlement to punitive damages," see Plaintiff's Brief in Support of Motion for Summary Judgment at 5, and has not actually moved for summary judgment as to Count I in his moving brief, nor does he argue that summary judgment should be granted in his favor on this count in opposition to Defendant's Motion.

[5] Plaintiff's Complaint is inartfully pled, but the Court interprets Count I of the Complaint to allege a violation of N.J.S.A. 17:29B-1 et seq., and requesting compensatory, consequential, incidental and punitive damages pursuant to that statute. It interprets Count IV as alleging an intentional, malicious and willful, i.e. "bad faith," termination of Plaintiff's benefits under the disability policy.

Plaintiff's citation of <u>Miglicio v. HCM Claim Management Corp.</u>, 282 N.J. Super. 331 (Law Div. 1995) to refute this clear statement of the law is unavailing. <u>Miglicio</u> does not state that there is a private right of action under the statute, and as such, is not relevant to the Court's inquiry as to Count I. Rather, the analysis in <u>Miglicio</u>, to the extent that it is relevant at all, bears on the Court's inquiry as to Count IV regarding whether termination of Plaintiff's benefits was taken in bad faith.[6] <u>Miglicio</u> stands solely for the proposition that a deviation from the standards set forth in N.J.S.A 17:29B-4(9) may be considered evidence of bad faith. <u>Id.</u> at 341 (citing <u>Pickett</u>, 131 N.J. at 473).[7]

The Court will therefore dismiss Count I of Plaintiff's Amended Complaint.

### C.     Breach of Contract

Count IV of Plaintiff's Amended Complaint alleges that Defendants "intentionally, maliciously and willfully" violated the terms of the insurance contract, and demands compensatory, consequential, incidental, and punitive damages. Plaintiff moves for summary judgment on Count IV on the grounds that (1) there was no reasonable basis for terminating Plaintiff's disability benefits, and (2) that the defendant knew and/or recklessly disregarded the

---

[6]As discussed in Section III.C., <u>infra</u>, the Court is first required to determine that Defendants' actions lacked a reasonable basis as a matter of law before even reaching the bad faith inquiry, and <u>Miglicio</u> is therefore relevant only upon reaching that step. <u>See</u> Polizzi Meats, Inc. v. Aetna Life and Cas. Co., 931 F. Supp. 328, 340 (D.N.J. 1996) ("The <u>Miglicio</u> court is addressing the issue of whether the insurer acted in bad faith. The court is not discussing the issue of the insurer's liability on the underlying claim, the polestar of the <u>Pickett</u> analysis.").

[7]Moreover, Plaintiff's citation of <u>Universal-Rundle Corp. v. Commercial Union Ins. Co.</u>, 319 N.J. Super 223 (App. Div. 1999) as having "adopted" the <u>Miglicio</u> analysis is puzzling, at best, as the Appellate Division in that case clearly rejected Plaintiff's argument that a determination of whether an insurer violated parts of the statute, separate and apart from the <u>Pickett</u> standard, is necessary to determine bad faith. <u>Id.</u> at 250 ("[N]othing indicates that the statutes establish a different or additional standard apart from the one articulated in <u>Pickett</u>").

fact that there was no reasonable basis for terminating Plaintiff's benefits. Defendants have moved for partial summary judgment to exclude Plaintiff's claims for bad faith, punitive, and compensatory damages on the grounds that there was a reasonable basis for the termination of Plaintiff's benefits.

In New Jersey, insurance policies, like all other contracts, are subject to an implied duty of good faith and fair dealing. Pickett, 131 N.J. at 467. An insured may pursue a cause of action for consequential damages against an insurer for a bad faith failure to pay benefits to which the insured is entitled pursuant to the policy. Id. at 461. See also Polizzi Meats, Inc. v. Aetna Life & Cas. Co., 931 F. Supp. 328, 334 (D.N.J. 1996).

In Pickett, New Jersey adopted the "fairly debatable" standard, a two-part inquiry, to evaluate whether an insurance claim was denied in bad faith. First, the insured is required to demonstrate "the absence of a reasonable basis for denying benefits of the policy." Pickett, 131 N.J. at 472. If the insured cannot establish a right to summary judgment on the absence of a reasonable basis for denying the benefits of the policy, the insured is not entitled to assert a claim for the insurer's bad faith refusal to pay the claim. Id. "This does not mean that if summary judgment is granted the insured has established a bad faith claim... [but rather] an insurer's disclaimer of coverage cannot be held to be in bad faith unless the insured is granted summary judgment on the issue of coverage." Hudson Universal Ltd. v. Aetna Ins. Co., 987 F.Supp. 337, 342 (D.N.J. 1997). Should the insured be able to demonstrate the absence of a reasonable basis, in order to demonstrate bad faith, he or she must show that the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim. Pickett, 131 N.J. at 473.

Thus, the Court is first required to determine whether Plaintiff is entitled to Summary Judgment on the grounds that Defendants had no reasonable basis for terminating Plaintiff's benefits. According to the Policy, Plaintiff is entitled to receive weekly benefits in the event of "totally disability," which is defined by the Policy as follows:

    (a)    Until the date you attain age 55, or until the date indemnity for total disability has been paid during a period of disability under this policy for 5 years, whichever is later, "Total Disability" means your inability to perform the duties of your occupation.

    (b)    During the continuance of a period of disability beyond the later of either of the dates named in (a) above, "Total Disability" means your inability to engage in any gainful occupation in which you might reasonably be expected to engage because of education, training or experience, and with due regard to your vocation and earnings at the beginning of disability.

    Id. at 4.

Although Plaintiff attained age 55 on December 20, 2001, because he has not received disability benefits under the Policy for 5 years, the definition of total disability found in part (a) of the Policy applies. As such, Plaintiff is "totally disabled" under the Policy if he is unable to "perform the duties of [his] occupation."[8]

The Court will first turn to Defendants' argument that the dispute over the accuracy of the work history submitted with Plaintiff's claim creates a genuine issue of material fact that automatically renders the termination of Plaintiff's benefits "fairly debatable." Defendants argue that because Plaintiff did not have an occupation for the three years prior to his claim, the ability to perform the duties of Plaintiff's occupation means the ability to perform no occupation at all. As such, they argue that Plaintiff is not entitled to benefits under the Policy.

_____

[8] In addition, in order to receive payments, Plaintiff is required to be under the care of a physician. Id.

-15-

The "fairly debatable" standard is "premised on the idea that when an insurer denies coverage with a reasonable basis to believe that no coverage exists, it is not guilty of bad faith even if the insurer is later held to have been wrong." Hudson, 987 F.Supp. at 341 (D.N.J. 1997). Thus, the Court is required to assess whether the insurer's decision to deny coverage, based on the evidence in its possession at that time, was reasonable. The Court is not making an independent determination of Plaintiff's entitlement to benefits under the Policy. See Polizzi, 931 F. Supp. at 334 ("the insured must demonstrate that 'no debatable reasons *existed* for denial of the benefits' available under the policy." (quoting Pickett) (emphasis added)).

Defendants' June 19, 2002 letter advising Plaintiff that his benefits would be terminated, and the September 19, 2002 letter acknowledging that their conclusions had not changed upon the receipt of supplemental evidence, demonstrate that the decision to terminate Plaintiff's benefits was not based on a determination that his initial claim was fraudulent. Rather, these letters make clear that the decision to terminate benefits was made because the medical and psychological evidence in the file no longer demonstrated that Plaintiff was unable to perform the occupation that he had reported. As such, the veracity of Plaintiff's September 24, 2001 claim is not relevant to the question of whether Defendants had a reasonable basis to believe that no coverage existed when they terminated Plaintiff's benefits because this information was not available to Defendants at the time.[9] Rather, as Defendants themselves note, if Plaintiff is

---

[9]For the same reason, the Court will not rely on independent neuropsychological and psychiatric evaluations of Plaintiff conducted in July, 2004 and February, 2004, respectively, in order to determine whether Defendants' July and September 2002 decisions lacked a reasonable basis.

ultimately found by the trier of fact not to have been working prior to his claim for disability benefits, Defendants would be entitled to seek all benefits paid under the policy.

The Court thus turns to the issue at the heart of this case– whether as Plaintiff argues, Defendants ignored the information in Plaintiff's file indicating that Plaintiff was "unable to perform the duties of his occupation," as it had been reported, or whether, as Defendants argue, there was enough evidence in the file indicating that Plaintiff had returned to his pre-claim status to form a reasonable basis for the decision to terminate benefits.

Plaintiff argues that Defendants' decision to terminate benefits lacked a reasonable basis because the information submitted by his treating psychologist and psychiatrist was read selectively, with Defendants picking out only the portions that might be interpreted as supporting a decision to terminate benefits and ignoring the evidence indicating that Plaintiff remained totally disabled.  The treatment notes of Dr. Pollard and Dr. Ortanez indicate Plaintiff's continued progression from the time that he first sought emergency medical treatment at Underwood Memorial Hospital.  For example, Dr. Pollard's treatment notes from December 21, 2001, January 18, 2002, and February 1, 2002,  respectively, state that Plaintiff was "improving," "feeling better and doing more," and "in good spirits, says he feels things are going much better." Similarly, Dr. Ortanez's notes indicate a steady progression.   On September 5, 2001, Plaintiff was "more calm," his "obsessive compulsive symptoms [were] less" and he was sleeping well at bedtime; on October 3, 2001, Plaintiff was reporting "no destructive thoughts"; on November 15, 2001, his "obsessive compulsive symptoms are still evident but less"; as of March 18, 2002, Plaintiff was "not psychotic" anymore; on May 6, 2002 Plaintiff "continue[d] to do well,

decreased obsessive compulsive disorder,"; and by June 17, 2002, Plaintiff was "doing well.... At present, he is not depressed anymore."

Plaintiff argues, however, that notations such as these do not indicate that he was able to return to work. Specifically, Plaintiff argues that the June 7, 2002 Attending Physician's Statement in which Dr. Pollard indicated that Plaintiff appeared "brighter" that was relied upon by Defendants in their June 19, 2002 termination letter, not only states that Plaintiff continued to suffer from "bipolar disorder most recent episode mixed: 296.24 severe," but also that Plaintiff had not been released to work. Plaintiff cites to cases arising under the law of the Employee Retirement Income Security Act ("ERISA") that repudiate such conduct. See Skretvedt v. E.I. DuPont De Nemours and Co., 268 F.3d 167, 182 (3d Cir. 2001); Thorpe v. Cont'l Cas. Ins. Co., 2002 WL 31845876, at *5 (E.D.Pa. Dec. 18, 2002). However, in ERISA cases, the Court is determining whether the denial of benefits was arbitrary or capricious, a different standard.[10] Because these cases do not analyze whether there was any reasonable basis for denying the claim, as the Court is required to do in this instance, they are of limited persuasive effect.

Here, Defendants did not ignore clear statements of the treating physicians indicating that Plaintiff could not return to the work he was doing prior to his claim. Neither Dr. Pollard nor Dr. Ortanez ever specifically stated that when they indicated that Plaintiff could not return to work, they were indicating that Plaintiff's disabilities would prevent him from working for ten to twenty hours per week delivering dog food. Indeed, Dr. Pollard's February 1, 2002 notes indicate that they discussed "again subject of working for somebody else," as opposed to working

---

[10]In ERISA cases in which the insurer determines who qualifies for benefits and also is the entity that pays for those benefits, courts apply a "heightened" arbitrary and capricious standard. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000).

for himself, an indication that Dr. Pollard was defining Plaintiff's ability to "work" as something other than delivering dog food for ten to twenty hours per week.

The absence of a connection between the indication that Plaintiff "could not work" and his inability to perform his former occupation is highlighted by the deposition testimony. Both Dr. Pollard and Dr. Ortanez initially testified that Plaintiff would be unable to perform occupational duties. Def. Exh. 13 at 60:4-9 (December 17, 2003 Deposition of Dr. Pollard), Def. Exh. 14 at 51:13-17 (October 30, 2003 Deposition of Dr. Ortanez). However, when specifically asked about Plaintiff's capability to make pet food deliveries for limited hours each week, each one acknowledged that Plaintiff would be able to do so under the right circumstances. Dr. Pollard stated that if Plaintiff "had a route where he had say 10 to 15 customers and for a few, I guess, for only working 10 to 15 hours a week only two hours a day delivering pet food to the same customers he always had," he "probably could" undertake such a task "if he somehow made the leap to seeing that that's what had to be done." Id. at 67:3-13. Dr. Ortanez admitted that Plaintiff may be able to make pet food deliveries "a few days a week" "if somebody will help him maybe organize it." Id. at 52:16-17; 53:3.

Moreover, to the extent that Dr. Pollard's Attending Physician's Statements conveyed to Unum that Plaintiff had not been "released to work in his/her occupation," it is by no means clear that Dr. Pollard was indicating that Plaintiff was incapable of delivering dog food for ten to twenty hours each week. Dr. Pollard independently questioned the legitimacy of Plaintiff's claim that he was actually delivering dog food as claimed:

Q.    [Delivering pet food is] something he did before, correct?
A.    Well, I'm not sure.  I mean, now he makes that statement.
Q.    Right

A.    You know, these signs you see on telephone poles about work out of your own home, I'm
      not sure anybody is actually doing that and I don't know that he was doing it, although he
      says he was.
      Id. at 66:8-12.

      Dr. Ortanez's statements at his deposition indicate that he was similarly unaware of the

nature and extent of Plaintiff's job responsibilities prior to his disability claim.

Q.    And do you know whether he had any other jobs after he closed the store if he did
      anything from the time he closed the store until he saw you?
A.    I think.  I'm not sure.  I think he tried to sell pet supplies to people on his own.
Q.    Like pet food delivery?
A.    Something like that.
Q.    Do you know how long he did that for?
A.    I'm not sure.

      Def. Exh. 14 at 27:21-28:5.

      The Skrevedt and Thorpe ERISA cases provide a useful factual comparison.  In those

cases, the courts criticized the insurer's selective reading of the plaintiff's file, which ignored

specific statements from the treating physicians as to why the plaintiff could not return to the

former occupation in question.  See Skretvedt, 268 F.3d at 182 (insurer's reliance on medical

report and letter from doctors indicating that plaintiff's medical condition had "improved"

ignored specific statements from these doctors indicating that he would be unable to go back to

his former position as an Environmental Engineer because of the anxiety that it would cause);

Thorpe, 2002 WL 31845876 (in terminating benefits of plaintiff who suffered from physical

disabilities resulting from Menier's disease and chronic fatigue syndrome, insurer relied on notes

indicating plaintiff's emotional improvement and ignored specific statements that, *inter alia*,

plaintiff was physically unable to put forth a effort 'for 8 hours or 2 days in a row.'").

Here, Plaintiff was initially granted benefits because there was sufficient evidence in the file to support a diagnosis of major depression, or bipolar disorder, based on evidence relating to agitation, mood dysfunction, and judgment. Benefits were authorized, in part, based on records indicating that Plaintiff required the care of a hospital's psychological service for approximately two weeks. Thus, the statements from Dr. Pollard and Dr. Ortanez indicating that Plaintiff's moods were "brighter" and that he was "no longer depressed," and that he had improved from the time that he was treated at Underwood, indicate a reasonable basis for the belief that Plaintiff did not have the same restrictions and limitations that he did when he initially received benefits.

Furthermore, when asked whether he remembered telling anyone at Unum in June 2002 that Plaintiff had returned to his baseline functioning, Dr. Pollard responded: "[w]ell, I don't remember that, although apparently they're saying that I did. And it might well be that I said listen, he's back to where he was before he went to the hospital. I mean, I certainly didn't mean to imply that he was where he was 20 years ago is what I'm saying." Def. Exh. 13 at 77:18-24. Dr. Pollard further acknowledged that he "might have" used the term baseline functioning, and it was a term that he used in every day conversation. Id. at 79:6-13. The Court notes that this discrepancy alone creates a genuine issue of fact as to Defendants' lack of a reasonable basis for terminating Plaintiff's benefits. In addition, to support a termination of benefits under the Policy, Plaintiff need not have been performing at the level that he had been twenty years ago. Rather, as Vaswani noted, Defendants only needed to determine that Plaintiff was functioning at the "minimal" baseline that had enabled him to make pet food deliveries for ten to twenty hours a week prior to his claim. Dr. Pollard and Dr. Ortanez failed to make statements to UnumProvident unequivocally indicating that Plaintiff was unable to perform the limited

occupational tasks that he was performing prior to his disability claim. The Court therefore cannot say, as a matter of law, that Defendants could not have reached this conclusion.

Plaintiff further contends that Defendants ignored the supplemental information contained in Dr. Pollard's August 19, 2002 letter to UnumProvident, and instead accepted the unreasoned conclusion of Dr. Ursprung that Plaintiff had "returned to his baseline state." Plaintiff mischaracterizes the August 19 letter as stating that "[Plaintiff] was unable to return to his prior occupation." Although Pollard states, *inter alia,* that Plaintiff cannot be responsible for complex tasks, has impaired concentration, and has numerous compulsive rituals, and concludes that "he is by no means free of symptoms or not disabled," Dr. Pollard nowhere makes an assessment of Plaintiff's ability to deliver dog food. Indeed, he specifically requests that Defendants "take this information into consideration when you evaluate his fitness to work." Defendants therefore were not ignoring specific, supplemental information indicating that Plaintiff could not return to delivering pet food for ten to twenty hours per week when it concluded for the second time that Plaintiff had returned to his baseline state.

On the other hand, this Court notes that a jury could certainly find in this case that Plaintiff's inability to concentrate and his compulsive rituals would prevent him from making pet food deliveries for ten to twenty hours each week, and that Defendants therefore lacked a reasonable basis to terminate Plaintiff's benefits. Moreover, a jury could also find that Defendants' conduct in reviewing Plaintiff's file was another example of the type of conduct renounced by courts in ERISA cases and found to have been arbitrary and capricious, a standard that is fairly deferential, even when heightened pursuant to Pinto. See, e.g., Thorpe, 2002 WL 31845876, at *10; Holzschuh v .Unum Life Ins. Co. Of Am., 2002 WL 1609983 (E.D.Pa. July

18, 2002); <u>Dorsey v. Provident Life and Accident Ins. Co.</u>, 167 F. Supp. 2d 846 (E.D.Pa. 2001).[11]

Thus, this case uniquely highlights the predicament posed by the <u>Pickett</u> analysis that was

pointed out by the court in <u>Tarsio v. Provident Ins. Co.</u>, 108 F. Supp.2d 397, 401 (D.N.J. 2000)

(Wolin, J.):

> [T]he jury may ultimately reject the insurer's evidence and find that the insurer possessed
> no basis to reject plaintiff's claim.  Certainly, after rejecting such evidence, other
> evidence may suggest that the insurer acted in 'bad faith.'  Yet, the jury is precluded from
> deliberating 'bad faith' simply because a court finds issues of fact as to the underlying
> claim.

Because the Court cannot find on this record that there was a complete absence of a

reasonable basis for concluding that Plaintiff was not "totally disabled" according to the terms of

the Policy, summary judgment cannot be granted in Plaintiff's favor on the underlying claim.  As

such, Plaintiff's bad faith claim is dismissed, and Plaintiff is not entitled to bad faith

consequential damages as a matter of law.

The standard for the recovery of punitive damages is even higher than for bad faith

consequential damages.  "In order to sustain a claim for punitive damages, a plaintiff would have

to show something other than a breach of the good-faith obligation as we have defined it."

<u>Pickett</u>, 131 N.J. at 475-76 (citing <u>Nappe v. Anschewelewitz, Barr, Ansell & Bonello</u>, 97 N.J. 37,

49-50 (1984)).  "[A]bsent egregious circumstances, no right to recover for... punitive damages

exists for an insurer's allegedly wrongful refusal to pay a first-party claim."  <u>Id.</u> at 476.  In order

to support an award of punitive damages, a defendant's conduct must be "wantonly reckless or

---

[11]The Court notes, however, that the ERISA cases do not hold, as Plaintiff suggests, that a
failure to conduct an Independent Medical Examination renders a decision arbitrary, or is
evidence of bad faith.  <u>See</u> <u>Dorsey</u>, 167 F. Supp.2d at 846 and n.10 (citations omitted).

malicious." Polizzi, 931 F. Supp. at 335 (citing Nappe). Because the Court will dismiss Plaintiff's bad faith damages claim, Plaintiff's claim for punitive damages is moot.

Finally, in order to recover compensatory damages, a plaintiff is required to demonstrate that the Defendants knew or should have reasonably foreseen that the insured was "'at risk' of economic loss in addition to the policy benefits and that 'ascertainable economic damages would ensue from the conduct' of the carrier." Id. at 475 (citing People Express Airlines, Inc. v. Consolidated Rail Corp., 100 N.J. 24, 262 (1985)). To survive a motion for summary judgment, Plaintiff must be able to produce evidence that, "when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." Kline v. First Western Gov't Sec., 24 F.3d 480, 485 (3d Cir.1994). Plaintiff points to nothing in the summary judgment record to demonstrate ascertainable economic damages flowing from Defendants' conduct, or that the Defendants knew or should have reasonably foreseen any economic loss in addition to Plaintiff's benefits, and therefore cannot maintain a claim for compensatory damages.

Thus, with respect to Count IV, Plaintiff's Motion for Summary Judgment is denied. Defendants' Motion for Partial Summary Judgment is granted, and Plaintiff's claims for bad faith consequential damages, punitive damages, and compensatory damages are dismissed.

## III.   CONCLUSION

Because there is no private cause of action under the Unfair Claims Settlement Act, the Court hereby grants Defendants' Motion as to Count I. With respect to Count IV, the Court finds that the termination of Plaintiff's benefits was fairly debatable, and denies Plaintiff's Motion for Summary Judgment, and grants Defendants' Motion for Partial Summary Judgment. An appropriate order will follow.

*Freda L. Wolfson*